# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 8, 2013 Session

## STATE OF TENNESSEE v. KWANE MORRIS

**Appeal from the Criminal Court for Shelby County**
No. 09-00769    Carolyn Wade Blackett, Judge

No. W2011-02339-CCA-R3-CD  -  Filed September 13, 2013

The Defendant, Kwane Morris, was convicted by a Shelby County jury of facilitation of first degree murder and received a twenty-two-year sentence for that conviction. In this direct appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress his statement to the police that was involuntary and coerced; (2) the evidence was insufficient to support his conviction; (3) the trial court erred by limiting his cross-examination of a State's witness for possible bias; and (4) the trial court erred by failing to give a jury instruction on accomplice testimony. Following our review of the record and the applicable authorities, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, Kwane Morris.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Colin A. Campbell and Tracye N. Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

In the late evening hours of November 7, 2008, fifty-five-year-old John Baker, the victim, was sitting at the desk in the office of his Shelby County home when he was killed by a stray bullet that pierced the window and struck him in the back of the head. The victim's home was located on the corner of Foyle Way and Foyle Cove East in Memphis. On February 5, 2009, a Shelby County grand jury charged the Defendant and his co-

defendant, Kenneth Spencer, with the first-degree murder of the victim. See Tenn. Code Ann. § 39-13-202. Their cases were later severed, and the Defendant proceeded to trial in May 2011.

The evidence at the Defendant's trial revealed the following facts. On October 31, 2008, just a week prior to this incident, the Defendant and his co-defendant had been involved in an earlier shooting with the victim's young neighbor, Arsenio Delk. Delk testified that he and his friends were at a crowded Halloween party that was being held in a neighborhood home, when he and Spencer were involved in an altercation. According to Delk, he "accidentally bumped" into Spencer, and Spencer responded by pulling a gun on him. The group proceeded outside of the home, where the men exchanged words; the Defendant was with Spencer at that time. Next, Spencer "walked up the street . . . to a white truck." Someone in Spencer's group turned on the vehicle's lights, so Delk and his friends could not see. Then Delk's "partner" called out the Defendant's name, and shots were fired.

Dedrick Nelson testified that he saw both the Defendant, with a .32 caliber weapon, and Spencer, with a .40 caliber weapon, shooting at Delk that night. Delk was struck in the forearm by a .40 caliber bullet.

On November 7, the evening in question, Recarlos Brown, Joshua Cole, and another individual named Calvin[1] went to Foyle Cove East in Cole's Cadillac Deville. Delk arrived home, and Cole spoke with him for "[n]o more than five minutes." After Delk left, Cole discovered that his car battery was dead. Cole then went to ask the victim, Delk's neighbor whom Cole knew, if he had any jumper cables they could borrow. The victim, after searching, was unable to provide jumper cables, so Cole called a friend, Robert Adams, to come help. Adams, along with a passenger, arrived in Adam's Crown Victoria at that location.

That same evening, the Defendant and Spencer were driven by Patrick Jefferson to a party in the victim's neighborhood. When they were turned away, the Defendant directed Jefferson to a cove in the neighborhood, showing Spencer where Delk lived. They drove slowly through the cove, and Jefferson observed two cars sitting there. The Defendant said to Spencer, "I think I see [Delk] in the car." Recarlos Brown identified the Defendant as one of the passengers in the car that drove through Foyle Cove East that night.

After Jefferson exited the cove, he was still being directed by the Defendant. According to Jefferson, he then pulled over on a nearby street so he could relay a text message. Jefferson then heard the Defendant say to Spencer, "You better get him before he

---

[1] Calvin's last name is not apparent from the record.

gets you[,]" and "He's going to get your family." According to Jefferson, the Defendant and Spencer were talking back and forth, "You got to get him[.]" Jefferson said to the two men, "Don't do nothing crazy."

Spencer then got out of the car and headed between two houses in the direction of the cove. Moments later, the group of men in the cove were being shot at from behind. After shots were fired, the group of men in the cove got inside Adam's car and left; Spencer ran back to the car, and they drove off.

Terrance Baker, the victim's son, returned home from work that evening. He called for his father but received no response. He located his father in the office, where he found the victim sitting in his chair in front of the computer. The victim still did not respond, and Baker saw blood coming from his father, so he called 9-1-1. According to the medical examiner, the victim died from a gunshot wound to the head.

Detective Robert Butterick of the Shelby County Sheriff's Department testified that he found a bullet hole in the window of the victim's office. After determining the bullet's trajectory, he began searching the area between two neighboring houses at the end of the cove and discovered three fired .40 caliber shell casings and a bullet projectile in a telephone junction box in front of the house. Further investigation into the murder led to the issuance of search warrants for the Defendant's and Spencer's homes. The subsequent search of the Defendant's home resulted in the seizure of ammunition and two semi-automatic weapons—a .40 caliber Smith and Wesson handgun and a .380 caliber handgun. During the execution of the search warrant at Spencer's home, Det. Butterick found and seized ammunition and a number of firearms—a pellet pistol, a .22 caliber pistol, and a .32 caliber semi-automatic pistol.

Det. Butterick testified that the ballistics evidence found at the crime scene, bullet fragments recovered from Delk's arm and from the victim's body, and a number of the items seized as a result of the search warrant were submitted to the Tennessee Bureau of Investigation ("TBI") laboratory for analysis. Testing confirmed that the three shell casings recovered from the scene were all fired from the .40 caliber pistol found in the Defendant's home. The fired bullets recovered from the victim's head, the cove, and Delk's arm were all consistent in shape, type, and design with the live rounds that were loaded in the .40 caliber gun, but they were too damaged for a conclusive determination that they had been fired from that same gun.

In a statement to Detectives Matthew Keaton and Terrell Robertson of the Shelby County Sheriff's Department, the Defendant admitted to his involvement in the shooting, stating that he directed Jefferson to the location of Delk's home, that they believed Delk was

out for revenge, and that he encouraged Spencer to get Delk first. Spencer also gave a statement to law enforcement, which was played in its entirety for the jury, wherein he admitted that he had shot toward two cars near the victim's house under the belief that Delk was inside one of them. Spencer also stated that, as he was exiting the vehicle, the Defendant told him not to shoot at one of the cars because the Defendant's friend, Robert Adams, was inside.

Following the conclusion of the proof, the jury found the Defendant not guilty of first degree murder but guilty of the lesser-included offense of facilitation. The trial court imposed a sentence of twenty-two years. This appeal followed.

ANALYSIS

On appeal, the Defendant raises four issues for our review: (1) whether the trial court erred in denying his motion to suppress his statement to the police that was involuntary and coerced; (2) whether the evidence was sufficient to support his conviction for facilitation of first degree murder; (3) whether the trial court erred by limiting his impeachment of Patrick Jefferson for possible bias; (4) whether the trial court erred by failing to give a jury instruction on accomplice testimony.[2] We will address each in turn.

*I. Suppression of Statement*

The Defendant argues that the trial court erred in denying his motion to suppress his statement to police because that statement was involuntary and coerced. The State argues that the Defendant has waived this issue by failing to include a transcript of the suppression hearing in the record on appeal. Waiver notwithstanding, the State contends that the trial court's conclusions detailed in the order denying the Defendant's suppression motion are supported by the recording of the Defendant's statement.

Preliminarily, we address the State's waiver argument because the transcript of the hearing on the motion to suppress is not included in the record. We agree that it is the duty of the accused to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal. See Tenn. R. App. P. 24(b) ("the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); see State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). Moreover, the failure to prepare an adequate record for review of an issue results in a waiver of that issue. Thompson v. State, 958 S.W.2d 156, 172

---

[2] For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

(Tenn. Crim. App. 1997). However, the record on appeal does contain the motion to suppress and the order denying the motion, wherein the trial court made detailed findings of fact and conclusions of law, along with the trial transcript and the tape containing the recorded statement the Defendant seeks to suppress. This will suffice for review of the issue presented.

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. Meeks, 262 S.W.3d at 722.

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled . . . to be a witness against himself" in a criminal case. U.S. Const. amend. V. Similarly, article I, section 9 of the Tennessee constitution provides that an accused "shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under article I, [section] 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)); see State v. Northern, 262 S.W.3d 741 (Tenn. 2008). The Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action. See, e.g., Colorado v. Connelly, 479 U.S. 157, 163-64 (1986).

A police officer is required to warn a suspect of his Miranda rights prior to a custodial interrogation. See Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); State v. Riels, 216 S.W.3d 737, 754 (Tenn. 2007). The Tennessee Supreme Court has stated, "The warnings and waiver mandated by Miranda 'are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant' during custodial interrogation, whether inculpatory or exculpatory." Northern, 262 S.W.3d at 749 (quoting

Miranda, 384 U.S. at 476). Any waiver of Miranda rights must be "made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

> The United States Supreme Court has interpreted the Fifth Amendment in part to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. This even applies to statements obtained after the proper Miranda warnings have been issued. Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible. It must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Moreover, due process requires that confessions tendered in response to either physical or psychological coercion be suppressed. This has evolved into the "totality of circumstances" test to determine whether a confession is voluntary.

State v. Thacker, 164 S.W.3d 208, 248 (Tenn. 2005) (internal citations omitted). Thus, to determine whether an accused's statements were voluntary, the appellate courts review the totality of the circumstances surrounding the waiver of the right against self-incrimination. Id. at 249 (citing Stephenson, 878 S.W.2d at 545).

Because we are without the benefit of transcript, we will quote extensively from the trial court's order denying the Defendant's motion to suppress. The trial court initially made the following findings of fact[3]:

> Officer Matthew Keaton and the Defendant, Kwane Morris, testified at the Motion to Suppress Hearing on April 26, 2010. Additionally, the video of the interview was entered into evidence. Based on their testimony and the video, the findings of fact are as follows:

> On November 13, 2008, Officer Keaton and Officer Terrell Robertson interviewed Defendant Morris regarding a homicide investigation. The Defendant was nineteen years old. The Officers read the Defendant his Miranda rights and Defendant Morris agreed to waive these rights.

---

[3] The Defendant and Spencer had a joint suppression hearing prior to severance of their respective cases. The facts summarized by this court in the co-defendant's direct appeal of the motion to suppress can be found at State v. Kenneth Spencer, No. W2010-02455-CCA-R3-CD, 2011 WL 6147012, at *1-2 (Tenn. Crim. App. Dec. 8, 2011).

-6-

During the course of the interview, Officers Robertson and Keaton urged the Defendant to confess. Officer Keaton advised the Defendant, ". . . I think you are covering for your boy and I need you to understand that covering for your boy can get you in prison . . . . For the same charge that he's going to catch." When the Defendant asked, "what charge is that," Officer Keaton responded, "It's probably going to be first-degree murder." It was shortly after that when Officer Robertson referred to himself as Uncle Terrell to Defendant Morris. Defendant Morris never refers to Officer Robertson as "Uncle Terrell." Shortly thereafter, Defendant Morris confessed to his role in the homicide.

Additionally, Officer Keaton suggested that he wanted to help the Defendant but the only way he could is if he confessed. He stated:

> "I'm trying to keep you out of this. I'm trying to keep you from this Charge but you won't let me help you. You've got to tell me everything. I've got to know the truth so that when I go to my bosses and the prosecutors I can explain to them hey man this kid was just at the wrong place at the wrong f--king time with the wrong f--king dude. That's what I can tell them but if you don't tell me the truth I can't tell them that and do you know what they're gonna tell me to do? Put him in jail with Ken and I don't want to do that. I don't want to do that to you, I don't want to do that to your dad. Okay, your family don't need this. Your dad don't need this."

Defendant Morris asked the officers what they could promise him and in response he was told by Officer Robertson, "I can't promise you nothing but you got to tell the truth." The State charged Defendant Morris with First-Degree Murder, and the Defendant is challenging the admissibility of the confession under the Due Process of the United States Constitution.

At trial, Det. Keaton testified that he took two statements from the Defendant. The recording played for the jury was the second statement; in the first statement, the Defendant denied any involvement in the shooting. Detailing the circumstances of the second statement, Det. Keaton testified that the Defendant was read his Miranda rights prior to giving his statement, that the Defendant indicated he understood those rights, that the Defendant's signature appeared on the rights waiver form, and that following the rights explanation, the Defendant wished to give a statement. Det. Keaton further explained that

he read the "first section" of the rights form to the Defendant and that the Defendant read the "second section" aloud.

According to Det. Keaton, the Defendant did not appear to be under the influence of drugs of alcohol at the time he gave his statement. The entire statement took "roughly an hour." Det. Keaton was also asked some general questions about the interrogation techniques used in the video in effort to get the Defendant to talk.

On cross-examination, Det. Keaton affirmed that he "brought" Det. Robertson into the interview room because Det. Robertson had a prior relationship with the Defendant. However, Det. Keaton stated that "the whole conversation" about Det. Robertson being the Defendant's "Uncle Terrell" was not a "preplanned situation[.]" Det. Keaton clarified that he got Det. Robertson because he was "the best interviewer" they had and that "[j]ust the fact that he [was] somehow connected to" the Defendant "didn't matter" to him. Det. Keaton stated that the "Uncle Terrell" reference did not call for Det. Robertson's excusal from the interview room.

In addition to the lack of a transcript, the Defendant has confused the matter even further on appeal by failing to accurately set forth his contentions in his appellate brief; the argument section challenging the denial of his motion to suppress is anything but clear. He relies on the following allegations in support of this issue: "(1) that [he] was in custody at the time that he gave the confession; (2) that the officers were required to advise [him] of his Miranda rights prior to interrogation; (3) that [both detectives] used improper interrogation tactics; [and] (4) that the improper tactics render[ed] the confession involuntary." Given this lack of clarity, we will develop and address the suppression issues presented by the Defendant in his appellate brief to the best of our ability.

In ruling on the voluntariness of the Defendant's confession, the trial court separately addressed many of the Defendant's concerns. First, the trial court discussed the Defendant's argument "that the statement was the result of promises or other inducements that raised the hope of leniency" and that "the statement was the result of trickery and deception by officers." Determining that this allegation was without merit, the trial court found as follows:

> In the present case, the verbal interactions between the officers and the Defendants was a cordial exchange free from threats. . . . The use of trickery and deception should be considered in the totality of the circumstances, as well.
>
> The Defendants' statements were not forced by Officer Robertson's or Keaton's statements. The officers' statements alone do not amount to an offer

-8-

or promise of leniency. . . . Officer Robertson informed Morris that he could not promise him anything and Officer Keaton made no promises to Morris.

Next, the trial court addressed the Defendant's contention "that the interrogation technique used by" Officer Robertson "was inappropriate . . . because he was a friend of the family." The trial court then recounted the following events from the Defendant's interview:

During the interrogation, Officer Robertson stated,

> "K.J., K.J. look at me. I been knowing you all your life man. Look at me K.J. You are way (inaudible) it ain't worth it man. Now look at me, look at me K.J., K.J. look at me. I'm the same uncle Terrell that knew you (inaudible). Let me get you some tissue. Look at me. I'm the same Uncle Terrell that (inaudible). Just tell him the truth man. Look at me K.J. look at me. Tell him what he need to know. If you was there say it. If you didn't do nothing own up to it man. Tell me K.J., K.J., tell me. I'll pray with ya, tell me, K.J. come on man. You know I ain't gone mess you over. Talk (inaudible), tell me (inaudible) is just tell me the truth."

Defendant Morris subsequently disclosed that his co-defendant shot the gun that killed the victim. Officer Robertson responded,

> "Now I want you to tell my partner what you just told me. I'll be with you every step of the way. I'll be with you every step of the way. Look at me. I trust this man with my life. He will not (inaudible) you off. K.J. I know your grandmamma, I know your granddaddy, I know your mama, I know your mama's mama, I know your mama twin sister. Don't do that to them man. Don't do it to me. Don't put me in no situation like this."

In concluding that this allegation was without merit, the trial court reasoned as follows:

> The use of this interrogation technique is a factor that must be considered in the totality of the circumstances. Tennessee Courts have not addressed the issue of this type of interrogation but the Supreme Court of the United States has heard a case involving similar facts. In Spano v. New York, 360 U.S. 315 (1959), the Supreme Court considered the techniques used by the officers in obtaining a confession from the defendant. In Spano, the defendant's

childhood friend, an officer, was instructed to "falsely" state information to the defendant to obtain a confession. Spano, 360 U.S. at 323. The Court reasoned that the friend was the only visible face that the defendant could trust and it was with that material that the officers felt they could overcome the defendant's will but that factor alone was not the only factor the Court considered when deciding to overturn the defendant's conviction. Id. The Court considered the totality of the circumstances.

In the instant case, Officer's Robertson's presence during the interrogation and his statements were not sufficient to declare that Defendant Morris' will was overborne. Defendant Morris voluntarily waived his rights and he knew that he could remain silent or request an attorney at anytime and he neglected to do so. Although he may not have been forthcoming, Morris was cooperative throughout the interview. Additionally, Officers Robertson and Keaton at no time gave Morris false hope as to what would happen to him if he cooperated. Also, Officer Keaton conducted the majority of the interview while Officer Robertson only participated intermittently. Officer Robertson did not misrepresent information to Morris at any time during the interrogation. Considering the totality of the circumstances, Morris' statements were voluntary and Officer Robertson's presence and statements did not amount to coercion.

The trial court then reviewed the totality of the circumstances surrounding both Defendants' confessions. The court ruled that "[c]onsidering the totality of the interrogation and the circumstances, the Defendants' statements were voluntary and there was no violation of the Due Process Clause of the Fourteenth Amendment." In so concluding, the trial court reasoned as follows:

Considering the totality of the circumstances here, the Defendants' respective wills were not overborne. Defendants were at least eighteen years old and had completed high school. During the interrogation, the Defendants were cooperative and did not deny their presence at the time of the shooting, although each originally denied their own involvement in the shooting. The Officers advised the Defendants of possible outcomes based on their level of involvement and suggested the best course of action was for the Defendants to talk to them. Although . . . Officers Robertson and Keaton told Defendant Morris that he did not "need to do this to his father" nor any of his other family members, this did not amount to coercion. Neither of the Defendants was coerced by the officers and they were certainly not forced to confess. Rather, this was arguably an appeal to the Defendants' [consciences].

-10-

In a final section, the trial court dealt with the Defendant's assertion that "the waiver of his Miranda rights was not knowingly and voluntarily given." The Defendant argued to the trial court "that the waiver could not be knowing and voluntary due to the failure of the officers to inform him of the charge that he faced or would face as a result of the statements made by him." The trial court determined that "the Defendants' waiver of their respective rights was knowingly, intelligently, and voluntarily given[,]" explaining as follows:

> The Officer read the Defendants their Miranda rights and then the Defendants read a passage that stated they understood these rights. Further, the Officer explained the definition of a word, coercion, with which the Defendants were unfamiliar. The Defendants stated that they understood these rights and waived them. Although the Defendants were young and inexperienced with police officers, they did not suggest in any way at the time of the waiver that they did not comprehend the warnings or the waiver.
>
> . . . .
>
> Morris argues that since he was not informed of the charge he faced or would face as a result of speaking with the Officers, his waiver was not knowing and voluntary. Miranda warnings consist of informing the Defendant that he has the right to remain silent, that he has the right to consult with an attorney and to have an attorney present and if he cannot afford an attorney one will be appointed to represent him, and an explanation that anything said can and will be used against him in court. Miranda, 384 U.S. 468-470. At the time of Morris' interrogation, he was not under arrest for any crime and it was not required that he be informed of a pending charge in lieu of his statements. Again, the Constitution only requires that a defendant know of the matters involved in the warnings, rather than the consequences of a waiver. Furthermore, during the interrogation, Morris asks if he has to answer questions and Officer Keaton informed him that he did not if he did not want to.

The Defendant, in his appellate brief, initially outlines the "in custody" requirements for Miranda purposes. A defendant's statements "made during the course of custodial police interrogation are inadmissible as evidence in a criminal case unless the State establishes that the defendant was advised of certain constitutional rights and waived those rights." State v. Anderson, 937 S.W.2d 851, 853 (Tenn. 1996) (citing Miranda, 384 U.S. at 444). The Miranda decision, by its own terms, "applies to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in any significant way." State v. Dailey, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting Miranda, 384

U.S. at 478) (internal quotation marks omitted). We see little need to toil long over whether the Defendant was in custody for purposes of Miranda. This is so because regardless of his custodial status he was actually given his Miranda warnings prior to the interrogation. Thus, a determination of whether he was in custody requiring Miranda warnings in not necessary.

The Defendant next makes a vague reference in his brief that his statement should have been suppressed as involuntary because he was under the influence or alcohol or drugs at the time he made that statement. However, this allegation was not raised in the motion to suppress and was not addressed by the trial court in its order denying the motion and, therefore, is arguably waived.[4] Nonetheless, it is well-established that a defendant's use of drugs or alcohol does not automatically render his subsequent confession involuntary. See State v. Morris, 24 S.W.3d 788, 805 (Tenn. 2000). In order for a court to suppress a statement given in such circumstances, the defendant's faculties must have been "so impaired that the confession cannot be considered the product of a free mind and rational intellect." Id. (quoting State v. Robinson, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)). "The test to be applied in these cases is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime." Id. Det. Keaton testified at trial that the Defendant did not appear to be under the influence of drugs or alcohol at the time he gave the statement. There is no evidence to support any allegation that the Defendant was intoxicated at the time he gave the statement.

In the trial court, the Defendant argued that he did not knowingly waive his Miranda rights because he was not informed of the purpose and scope of the pending investigation. Although not stated exactly that same way in the Defendant's brief, we feel constrained to note our agreement with the trial court that there is no constitutional requirement that the Defendant be so informed. See, e.g., State v. Kristin M. Myers, No. E2012-00494-CCA-R3-CD, 2013 WL 1094981, at *7 (Tenn. Crim. App. Mar. 18, 2013) (Miranda did not require that defendant be told that her husband was in fact deceased and that she was the subject of a murder investigation before giving a voluntary confession), perm. app. denied, (Tenn. July 10, 2013). Neither the United States Constitution nor the Tennessee Constitution mandates that a criminal suspect be apprised of every possible consequence of a Miranda waiver. See Colorado v. Spring, 479 U.S. 564, 573-77 (1987) (the Court held that the failure of law enforcement officials to inform a suspect of all the possible subjects of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his or her Fifth Amendment privilege); State v. Green, 995 S.W.2d 591 (Tenn. Crim. App. 1998) ("Miranda v. Arizona does not require the interrogating officers to advise a defendant of the nature of the crime under investigation.") (citing State v. Stearns, 620 S.W.2d 92, 95

---

[4] The trial court did address the co-defendant's allegation that his Miranda waiver was involuntary due to his medication usage.

(Tenn. Crim. App. 1981)); Cf. State v. Stearns, 620 S.W2d 92, 95 (Tenn. Crim. App. 1981) ("Though a prisoner's ignorance of the charge against him might conceivably be a circumstance worthy of consideration with respect to the "totality of circumstances[.]"). Here, the Defendant was properly given his Miranda warnings, and he voluntarily spoke with officers. We conclude that the evidence presented at trial supports a conclusion that, under the totality of these circumstances surrounding the waiver, the Defendant voluntarily, knowingly and understandingly waived his Miranda rights.

The Defendant focuses most of his argument on appeal on the interrogation techniques used by the officers, citing only to the exact portions of the interview delineated in the trial court's order. First, the Defendant notes Det. Robertson's reference that he was the Defendant's "Uncle Terrell," and then the Defendant argues, "The officer asserting himself as a family member based on his history with the Defendant and his family and then inferring that the Defendant's failure to confess is going to hurt him and put him in a compromising or untenable situation crosses the line for proper interrogation techniques." The Defendant also challenges Det. Keaton's interrogation techniques. He asserts,

> A review of [Det. Keaton's] statements to the Defendant clearly show that he is suggesting, if not promising, the Defendant that if he gives a statement that he can go to his bosses and tell them not to charge [the Defendant.] However, if he doesn't give a statement that his bosses are going to tell him to "put him in jail with Ken."

A court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, "both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000); accord Smith, 933 S.W.2d at 455. Circumstances relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting State v. Readus, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988)); see also State v. Carter, 16 S.W.3d 762, 769 (Tenn. 2000). However, no single factor is necessarily determinative. State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (citation omitted).

The trial court in this case correctly observed that these types of interrogation techniques are to be considered in the totality of the circumstances. Promises of leniency by state officers do not render subsequent confessions involuntary per se: "'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are compelled by promises of leniency.'" Smith, 933 S.W.2d at 455-56 State v. Kelly, 603 S.W.2d 726, 729 (Tenn. 1980). The critical question in relation to police deception is "'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . .'" Id. at 455-56 (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)).

Regarding the Defendant's allegation that Det. Robertson should not have been present due to his personal relationship with the Defendant or should not have referred to himself as "Uncle Terrell" during the interview, we agree with the trial court that this does not per se render the Defendant's statement involuntary. The exact extent of Det. Robertson's and the Defendant's relationship is unclear. Det. Robertson did not testify at trial, and relying on the trial court's findings of the fact, he did not testify at the motion to suppress hearing either. However, as noted by the trial court, the Defendant never once referred to Det. Robertson as "Uncle Terrell" during the interview. It does not appear that the two men were extremely close but rather only that Det. Robertson had some knowledge of the Defendant and his family. Det. Keaton referred to their relationship as "somehow connected" to one another. The trial court also noted that Det. Keaton conducted the majority of the interview while Det. Robertson "only participated intermittently" and, at no point, misrepresented information to the Defendant. This factor alone was not enough to declare the Defendant's will overborne. See e.g., State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984) (defendant's contention that he was influenced by interrogating officer because of their family and personal relationship was without merit).

The Defendant alleges that his statement was involuntary because it resulted from trickery, deception, and promises of leniency made to him by his interviewing officers, which overbore his free will. While the detectives urged the Defendant to confess, the trial court determined that neither officer ever made a false promise to the Defendant. Det. Keaton told the Defendant that if he made a statement then he would make the Defendant's cooperation known to his "bosses and the prosecutors[.]" Det. Keaton made several similar statements throughout the interview, such as "I'm trying to keep you from this Charge but you won't let

me help you" and that if the Defendant did not talk to the detectives, then his "bosses" would tell him to put the Defendant "in jail with Ken." At one point in the interview, the Defendant asked what could the detectives promise him, and Det. Robertson specifically stated that they could not promise the Defendant anything in exchange for his cooperation. The trial court also found that Det. Keaton did not make any specific promises to the Defendant. The trial court concluded that, at no time, did the detectives give the Defendant "false hope as to what would happen to him if he cooperated[,]" rather, they were arguably trying to appeal to the Defendant's conscience. After the Defendant confessed, it is clear from the videotape that he still anticipated a long prison term for his participation in the shooting. We cannot conclude that the detectives' statements amounted to enforceable promises of leniency. See, e.g., State v. Chad Medford, No. E2012-00335-CCA-R3-CD, 2013 WL 2424137, at *11 (Tenn. Crim. App. June 5, 2013) (sheriff's statements to defendant that "it would be 'the greatest benefit to you that you could ever imagine' and that 'the good word' law enforcement officers would pass on to the district attorney's office 'is gonna make all the difference in the world'" could not be considered enforceable promises of leniency or a lesser sentence when viewed against the sheriff's prior admonitions to defendant that the district attorney's office would decide the charges only after the defendant confessed); see also Spencer, 2011 WL 6147012, at *9-11 (co-defendant made similar arguments on appeal for suppression of his statement, to no avail).

Upon our review, we conclude that the record supports the trial court's conclusions that the Defendant's statements were voluntarily given and were not the result of police coercion or promises of leniency. The nineteen-year-old Defendant, who had completed high school, was provided with Miranda warnings before he made the statement, and he signed a waiver of his rights. He read the "second section" of those rights aloud, as shown on the videotape. Det. Keaton testified at trial that the Defendant did not appear to be under the influence of drugs or alcohol at the time he made the statement. It is clear from the videotape that the Defendant had some prior experience, even if limited,[5] with the criminal justice system. The entire interrogation lasted approximately one hour. As the trial court noted, the Defendant was "cooperative" throughout the interview, although originally denying his involvement in the shooting. When looking at the totality of the circumstances, we cannot say that the trial court erred by denying the motion to suppress and admitting the statement as evidence at the Defendant's trial.

*II. Sufficiency of the Evidence*

---

[5] The trial court found that "the Defendants were young and inexperienced with police officers[.]" However, in the videotape, the Defendant makes statements about being previously incarcerated and charged in a separate case. This was the Defendant's second statement. It appears that he was likewise given Miranda warnings at the first interview. See Spencer, 2011 WL 6147012, at *1.

The Defendant has challenged the sufficiency of the evidence supporting his conviction for facilitation of first degree premeditated murder. He specifically argues that the evidence is insufficient because "there was no clear and credible testimony stating that the Defendant was aware that Kenneth Spencer planned to shoot at two cars parked in the Foyle Cove East." The State responds that "the evidence is legally sufficient to support the jury's conclusion that the [D]efendant knew Spencer intended to kill Mr. Delk by firing upon the group in front of Mr. Baker's house and provided substantial assistance to him."

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of facilitation of first degree murder. First degree murder is the intentional and premeditated killing of another. Tenn. Code Ann. § 39-13-202(a)(1). Facilitation occurs "if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn.

Code Ann. § 39-11-403(a).[6] Thus, in this case, the State was required to prove beyond a reasonable doubt: (1) that the Defendant knew his co-defendant intended to commit murder and (2) that he furnished substantial assistance to his co-defendant in the commission of the offense. "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b).

Determining whether the Defendant knew of his co-defendant's intent required the jury to consider the Defendant's mental state, which is a factual question for the jury to resolve. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010) (citing State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000)). The Tennessee Supreme Court has explained that circumstantial evidence is often the only means of proving mental state: "[W]hile a defendant's mental state is rarely subject to proof by direct evidence, it is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' from surrounding facts and circumstances." Id. (citations and quotations omitted).

Indeed, in this case, the evidence in the light most favorable to the State, showed that the Defendant and his co-defendant had a prior altercation with Delk at a Halloween party, during which time both the Defendant and co-defendant Spencer shot at Delk, hitting him in the forearm with a .40 caliber bullet. Just a week later, on November 7, 2008, the Defendant and Spencer were driven by Jefferson to a party in Delk's neighborhood. After being denied admittance to this party, the Defendant directed Jefferson to the location of Delk's home in Foyle Cove East and pointed out Delk's house to Spencer. At that time, there were two cars and several men gathered in the cove. According to Jefferson, the Defendant said to Spencer, "I think I see [Delk] in the car." Recarlos Brown identified the Defendant as a passenger in Jefferson's vehicle.

Jefferson then drove away from the cove but soon thereafter stopped the car on a nearby street to relay a text message. Around this time, Jefferson overheard the Defendant encouraging his co-defendant Spencer, saying, "You better get him before he gets you[,]" and "He's going to get your family." As Spencer was getting ready to exit the car, the Defendant requested of Spencer that he not shoot at Robert Adam's vehicle. The co-defendant then

---

[6] In his brief, the Defendant cites to the criminal responsibility statute, which is also known as accomplice liability, in his sufficiency section. The statute governing accomplice liability codified the common law theory, which provided equal criminal liability for principals, accessories before the fact, and aiders and abettors. See State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008) (quotation and citations omitted). However, the Defendant was clearly not convicted under a theory of criminal responsibility, as he was found not guilty of first degree murder. Instead, the Defendant was found guilty of the lesser-included offense of facilitation, which, by its statutory definition, specifically excludes the intent required for criminal responsibility.

exited the car and shot at the group of men in the cove. As a result, a stray bullet hit the victim, sitting inside his home, in the head, killing him.

Testing confirmed that shell casings from the scene were fired through the 40. caliber weapon found inside the Defendant's home. The bullets recovered from the victim's head, the cove, and Delk's arm were all consistent in shape, type, and design with live bullets that were loaded in the .40 caliber weapon. Both the Defendant and Spencer gave statements to law enforcement admitting to their involvement in the shooting.

Based on this evidence, the jury could have reasonably inferred that the Defendant was aware of Spencer's intent to kill Delk by firing upon the group of men and that the Defendant furnished substantial assistance in that endeavor. Accordingly, the evidence supports the Defendant's conviction for facilitation, and he is not entitled to relief on this issue.

*III. Impeachment Evidence*

The Defendant contends that he "was unable to fully impeach Patrick Jefferson," noting that he "attempted to elicit evidence that the witness, Patrick Jefferson[,] was not credible because he had entered into a Memorandum of Understanding with the State and had been arrested several times since the November 8, 2008 incident." He explains,

> [W]hen counsel for [the] Defendant began to impeach Patrick Jefferson regarding his pending charges, the trial court and counsel for the State suggested that Jefferson needed to have his lawyer present. In fact, despite the fact that Jefferson had already pled guilty and had no 5th Amendment right against self-incrimination the court contacted and had his counsel come to court to counsel him.

The Defendant contends that he was denied his right to show the witness's bias. The State responds that the Defendant is not entitled to relief on this issue because he "consented to allowing Mr. Jefferson being advised by counsel and that [he] was able to fully cross-examine and attempt to impeach Mr. Jefferson."

Initially, we note that although neither party has commended the issue to us, this court has noticed upon review of the record that the issue is not included in the Defendant's motion for new trial or amended motion for a new trial and that the motion for new trial transcript is not included in the record on appeal.[7] See Tenn. R. App. P. 3(e) (stating that "no issue

---

[7] Defense counsel filed a motion to supplement the record with the "original transcripts" of the motion for

(continued...)

presented for review shall be predicated upon error in . . . jury instructions granted or refused, . . . unless the same was specifically stated in a motion for new trial"). Thus, the issue has been waived. Due to the Defendant's waiver of this issue, we examine the issue solely to determine whether plain error review is appropriate.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In determining whether plain error review is appropriate, the following factors must be established:

> (a) The record . . . clearly establish[es] what occurred in the trial court;
> (b) a clear and unequivocal rule of law [has] been breached;
> (c) a substantial right of the accused [has] been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006). On appeal, the defendant has the burden of establishing that these five factors are met. State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007) (citing State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

The Defendant cites Tennessee Rule of Evidence 616, which permits a party to "offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." The right to question a witness as to potential bias is a recognized fundamental right. Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986); State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). "Although the trial court retains discretion regarding the exercise of the right to examine witnesses for bias, any undue restriction on that right may violate a defendant's right to confrontation under the Sixth

---

[7](...continued)

new trial and the sentencing hearing, which he stated were "still" in his possession. This court granted that request, ordering the trial court clerk to supplement the record. However, no supplemental record was ever filed, and the Shelby County Criminal Clerk noted in its subsequent certification to this court that "the requested supplemental transcripts are not to be found, nor have they been provided by the attorney of record[.]"

Amendment of the United States Constitution and [a]rticle 1, [s]ection 9 of the Tennessee Constitution." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (citations omitted). To prevail, the Defendant must establish that "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses." Van Arsdall, 475 U.S. at 680; see also Rice, 184 S.W.3d at 670.

The right of a defendant to impeach a witness for bias "includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). A potential for bias exists when "a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial" due to the possibility that the prosecutor's office would "take favorable testimony into account when subsequently prosecuting the witness's pending charge." State v. Eric James Taylor, alias, No. E2002-00966-CCA-R3-CD, 2003 WL 21542464, at *5 (Tenn. Crim. App. July 9, 2003); see also State v. Echols, 382 S.W.3d 266, 285-87 (Tenn. 2010).

Because the transcript of the motion for new trial hearing is not included in the record on appeal, it is arguable that the appellate record does not clearly establish what occurred in the trial court. However, because waiver occurred due to the Defendant's failure to include the issue in his motion for new trial, and therefore, the issue was likely not addressed at the hearing, we will proceed to an analysis of the remaining plain error factors.

At the outset of the trial, defense counsel referenced that he had filed a motion generally requesting any impeaching information of government witnesses. Specifically, with regard to the witness Patrick Jefferson, defense counsel noted that he wanted information about whether Jefferson had received promises of consideration in exchange for his cooperation with the State in the Defendant's trial. Defense counsel asserted that Jefferson had "been arrested several times since this matter" and that he had a robbery charge reduced to a conviction for theft. The prosecutor responded that the "only thing" Jefferson had been convicted of was theft and that they would provide any information with regard to that conviction. As far as Jefferson's cooperation in this matter, the prosecutor noted that "the State took a proffer from him at the outset of this investigation[,]" and Jefferson gave a statement to law enforcement, but Jefferson had not received any promises of consideration in this case. Defense counsel then noted that Jefferson also had a statutory rape charge pending. The prosecutor confirmed that a statutory rape charge was pending but asserted that the case had not been discussed "in any way, shape or fashion" and that Jefferson had not "been offered anything in exchange for" his cooperation on this case. Defense counsel

averred that Jefferson "was set for sentencing today on another matter"[8] but that matter had been postponed until after the Defendant's trial was completed. The trial court then determined that the defense could ask about convictions for impeachment purposes but not about any pending matters.

During the direct examination of Jefferson, the trial court held a bench conference on the issue of impeaching information. The State informed the court that Jefferson had pled guilty to misdemeanor theft but that he not been sentenced yet and was applying for diversion. The State objected to cross-examining Jefferson about the theft conviction, arguing that the matter had "not been disposed of" and that Jefferson "might get his diversion." Defense counsel noted that the theft conviction had "been disposed of" but that Jefferson had not "been sentenced." Defense counsel averred that "anything that [Jefferson] ha[d] pending for which he [might] benefit" and which provided him with "motive . . . to cooperate and give testimony" was proper material for cross-examination. Defense counsel again noted that Jefferson had a statutory rape charge pending and had been arrested several times since this matter occurred. In conclusion, defense counsel argued, "I think the jury should be able to hear that for purposes of determining whether or not he is going to get some benefit depending on how he performs at this trial." The prosecutor once more lodged an objection to any questioning about the theft charge because Jefferson had not "been sentenced yet" and could obtain diversion. The trial court ruled that the defense could question Jefferson about the theft conviction, including that it was reduced from a robbery charge, as it was "all part of the negotiation."

Thereafter, the State questioned Jefferson about his conviction for theft and that it was reduced from a robbery charge. Jefferson testified that the district attorney's office did not make any promises to him in exchange for his testimony against the Defendant.

Jefferson was then thoroughly cross-examined about the Memorandum of Understanding he entered into with the State prior to making a statement to law enforcement in this matter. Jefferson confirmed that he not been charged in relation to the victim's death. Defense counsel then asked about the prior robbery charge and attempted to question Jefferson about the facts underlying that conviction. As defense counsel persisted in questioning Jefferson about the robbery charge, Jefferson asked if he could "plead the Fifth." Defense counsel requested that the witness be instructed to answer the questions because he did not have any Fifth Amendment rights following his guilty plea. The court warned defense counsel that if he continued in this vein, then the court would have to obtain Jefferson's lawyer to assist him in answering his questions. Defense counsel then asked Jefferson about his robbery charge being reduced to a theft conviction and that sentencing

---

[8] It appears that this references sentencing on the theft conviction.

on that charge had been rescheduled. Next, defense counsel inquired about how Jefferson was able to obtain such a "good deal."

When defense counsel asked, "Do you think that you have any responsibility for driving and stopping the car and letting Ken hop out of the car?", the prosecutor objected. The prosecutor reasoned that Jefferson needed his counsel present before answering that question because the defense was "asking [Jefferson] to throw himself in as a [d]efendant in this case right now." Defense counsel replied, "I mean that's what the memorandum says." The prosecutor disagreed that the memorandum stated such, and defense counsel said, "Well, then I think [Jefferson's counsel] does need to be here, then." The court then took a recess to obtain Jefferson's lawyer's presence before questioning resumed.

Again, the Defendant's exact challenge to the trial court's ruling is murky at best, discussing the Memorandum of Understanding, Jefferson's pending charges, and Jefferson's right to self-incrimination on the theft charge. First, Jefferson's counsel's presence was obtained in response to questioning designed to elicit a response from Jefferson implicating himself in this case. Jefferson's counsel was not obtained to advise Jefferson about the theft conviction; defense counsel abandoned further questioning of Jefferson about the facts underlying the theft conviction. At the time Jefferson's counsel was actually summoned, defense counsel assented to Jefferson's counsel presence.

Turning to the challenged impeachment evidence, we note that the defense was allowed to question Jefferson about the theft conviction, albeit not about the specific facts of that conviction. Moreover, the defense was allowed to examine Jefferson about the fact that the theft had been reduced from a charge of robbery and that his sentencing on that conviction had been postponed. What the State fails to take into account is that the defense also indicated a desire to question Jefferson about "three or four" subsequent arrests "since this event," including a pending statutory rape charge, and that the trial court ruled that defense counsel could not question Jefferson about any pending charges, only about convictions. Nonetheless, any error by the trial court in this regard would be subjected to a harmless error analysis. See Echols, 382 S.W.3d at 286-87.

The Defendant and his co-defendant confessed to their involvement in the shooting. Ballistics evidence connected the gun found in the Defendant's home to shell casings found at the scene, and Recarlos Brown's testimony also placed the Defendant at the scene. The trial court did permit the Defendant to question Jefferson about his recent conviction for theft, including whether the State had promised him favorable treatment as to that charge in exchange for his testimony. The defense was also allowed to thoroughly question Jefferson about the Memorandum of Understanding he entered into before giving his statement in the present matter. Furthermore, because the Defendant did not offer any other evidence of a

possible connection between the additional arrests and the pending statutory rape charge and Jefferson's testimony against the Defendant at trial, the evidence excluded as a result of the error was limited to the mere existence of those arrests and charges. See Echols, 382 S.W.3d at 287 (citing Sayles, 49 S.W.3d at 279-80 (noting that error deprived the defendant of the opportunity to examine witnesses regarding a possible connection between the leniency afforded the witness and his testimony)). In fact, the prosecutor averred that Jefferson had not been promised anything in those matters in exchange for his testimony against the Defendant. Even if the trial court erred in refusing to allow the requested cross-examination, such error would be harmless beyond a reasonable doubt, and therefore, we cannot conclude that consideration of the error is necessary to do substantial justice. Accordingly, plain error review is not warranted, and this issue is without merit.

### IV. Accomplice Instruction

On appeal, the Defendant argues that the trial court erred by failing to give a jury instruction on accomplice testimony.[9] His argument is two-fold. First, the Defendant claims that the trial court erred by failing to instruct the jury that Patrick Jefferson was an accomplice as a matter of law whose testimony must be corroborated. Alternatively, he submits that, if the evidence was unclear, raising a question of fact, then the jury should have been charged to decide whether Jefferson was an accomplice, and if so, whether there was sufficient corroborating evidence.

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). An accomplice is a person who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (footnote omitted). To qualify as an accomplice, it is not enough that the witness possess guilty knowledge, be morally delinquent, or even have participated in a separate but related offense. See State v. Lawson, 794 S.W .2d 363, 369 (Tenn. Crim. App. 1990). The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted).

---

[9] In the opening section of his brief dealing with this issue, the Defendant cites to Brady v. Maryland, 373 U.S. 83, 87 (1963), and State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999), in support of his argument that the trial court erred in instructing the jury. However, Brady and the instruction outlined in Ferguson deal with the State's duty to preserve evidence, and those cases are totally inapplicable to the present issue of an accomplice instruction.

This court has previously considered the issue of whether the court or the jury determines a witness's status as an accomplice:

> The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide the issue. On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness was an accomplice. If the jury finds the witness was an accomplice, the jury must decide whether the evidence adduced was sufficient to corroborate the witness's testimony.

Griffis, 964 S.W.2d at 588 (footnotes omitted); see also T.P.I.—Crim. 42.09. In other words, if the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and must instruct the jury that this witness's testimony must be corroborated. However, if the evidence is unclear, then the issue of whether a witness is an accomplice is a question of fact for the jury to decide, and if the jury decides that the witness is an accomplice, then it must determine whether there is sufficient evidence corroborating the witness's testimony. Griffis, 964 S.W.2d at 588; see Lawson, 794 S.W.2d at 369; Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978).

The record is clear that Jefferson disputed his status as the Defendant's and Spencer's willing accomplice. Jefferson testified that he was not involved in the shooting in any way but was merely driving the Defendant and Spencer through the neighborhood. He claimed that he did not know that the two men led him to the cove to shoot at Delk prior to their attempt to do that very act. Thus, we cannot say that the trial court erred in failing to charge the jury that Jefferson was the Defendant's accomplice as a matter of law whose testimony required corroboration.

However, the trial court also failed to present this factual dispute to the jury in its instructions. We agree with the Defendant that there was evidence in the record from which the jury could have inferred that Jefferson was an accomplice. It does not matter that there was insufficient evidence for law enforcement to charge Jefferson as a criminally responsible party to this crime; what matters is that the issue was raised by the evidence and should have been submitted to the jury. Jefferson testified that he drove the two men to the cove, that he did so knowing that they were looking for Delk, and that he overheard their conversations about seeking revenge. Nonetheless, even when evidence exists that would support a finding that a witness is an accomplice, and the trial court fails in its duty to instruct the jury

concerning accomplice testimony, such an error is subject to harmless error analysis. See State v. Ballinger, 93 S.W.3d 881, 888 (Tenn. Crim. App. 2000). We will find such an error to be harmless when "the record contains sufficient corroboration to [the accomplice's] testimony." Id.

The State presented ample evidence at trial to corroborate Jefferson's testimony if the jury had found him to be an accomplice to first degree murder. "[C]orroborating evidence is sufficient if it connects the accused with the crime in question." Griffis, 964 S.W.2d at 589. Both the Defendant and Spencer confessed to going to the cove in an effort to find Delk and that Spencer shot at the men once there. Ballistics evidence confirmed the Defendant's presence on the scene. Recarlos Brown identified the Defendant as a passenger in Jefferson's vehicle. This testimony constitutes more than sufficient corroboration of the accomplice's testimony in this case. See State v. Alisha J. Glisson, No. M2006-02115-CCA-R3-CD, 2008 WL 624929, at *9 (Tenn. Crim. App. Mar. 5, 2008) (while neither the accomplices' testimony nor the defendant's confession standing alone were sufficient to establish the crime, this evidence taken together, however, was sufficient to support the defendant's conviction).

Furthermore, Jefferson was vigorously cross-examined at trial about his participation in these events and the Memorandum of Understanding he entered into with the police prior to giving his statement. Importantly, the Defendant was convicted of facilitation, not first degree murder; the jury did not even find the Defendant, much less Jefferson, guilty under a theory of accomplice liability.[10] Consequently, any failure to properly instruct the jury concerning Jefferson's status as an accomplice or the need for his testimony to be corroborated would have been harmless. The Defendant's claim that the trial court erred by failing to give the jury an accomplice instruction is denied.

## CONCLUSION

In accordance with the foregoing reasoning and authorities, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[10] We feel constrained to note that the jury did not receive the necessary criminal responsibility instruction in the court's charge to the jury. See Tenn. Code Ann. § 39-11-402, T.P.I.—Crim 3.01. The instruction was totally absent, and the Defendant, found guilty of facilitation, received the benefit of its absence.